STATE OF CONNECTICUT *v.* CLINTON MILNER
(12980)

PETERS, C. J., HEALEY, CALLAHAN, GLASS and HULL, Js.

Argued November 3, 1987—decision released March 15, 1988

*Carmine Giuliano,* with whom was *David A. Dee,* for the appellant (defendant).

*Geoffrey E. Marion,* deputy assistant state's attorney, with whom, on the brief, were *Lawrence J. Daly* and *James G. Clark,* assistant state's attorneys, for the appellee (state).

CALLAHAN, J. The defendant, Clinton Milner, was charged in an information with having murdered twenty-three year old Susan Kennedy on August 4, 1984, in violation of General Statutes § 53a-54a.[1] On October 19,

---

[1] General Statutes § 53a-54a (a) provides: "MURDER DEFINED. AFFIRMA-TIVE DEFENSES. EVIDENCE OF MENTAL CONDITION. CLASSIFICATION. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant com-

1985, a jury found the defendant guilty as charged and he was sentenced by the trial court to a term of life imprisonment. He now appeals from the judgment of conviction.

The jury could reasonably have found the following facts. At approximately 5 a.m., on August 4, 1984, in response to loud screams emanating from a parking lot behind 87/89 Sumner Street in Hartford, approximately ten people rushed to the area and found Susan Kennedy naked, kneeling in a puddle of blood and holding her stomach. Her clothes and belongings were in a pile approximately twenty-five feet from the spot where she was kneeling. Kennedy was rushed to St. Francis Hospital and Medical Center where she was pronounced dead on arrival. An autopsy revealed that her death resulted from twelve stab wounds to the chest and abdomen which penetrated multiple organs.

Numerous witnesses placed the defendant at the scene of the crime or in its immediate vicinity while others observed him running away from Sumner Street. In addition, there was testimony indicating that he had been carrying a knife in the hour immediately preceding Kennedy's murder.

Subsequent to the murder, while the defendant was being held at the Hartford Correctional Center, he told a fellow inmate that he had grabbed the victim, dragged her to the back of an alley and put a knife to her chest. Additionally, he told another inmate that he had a chance of beating the case because of the lack of evidence. He indicated that, while the knife admit-

mitted the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

ted into evidence was his, the state could not prove it, nor could they find the clothes he wore the morning of the murder.

On appeal, the defendant claims that the trial court erred in: (1) excluding from evidence the fact that Robert Torres, a witness and originally a suspect, had been arrested for giving false statements to the police; (2) admitting into evidence as a "business record" under General Statutes § 52-180[2] the hearsay statement of an anonymous phone caller contained within a police report; (3) restricting the scope of the cross-examination of a state's witness, Yvette Gonzalez; (4) denying the defendant's motion to suppress the pretrial photographic identification of the defendant by a state's witness, Paul Cooper; and (5) ruling that the "open file policy" of the state's attorney's office did not result in a deprivation of his sixth amendment right to effective assistance of counsel or his right to due process under the fourteenth amendment. Additional facts relevant to these issues will be set forth where necessary.

I

During a search of the victim's home, the police discovered two sets of directions to Robert Torres' apartment located at 79 Sumner Street. As a result, a search warrant was issued for Torres' apartment which the police executed that same day. Although Torres was not present during the search of his home, he did appear at Hartford police headquarters two days later on

[2] General Statutes § 52-180 (a) provides: "ADMISSIBILITY OF BUSINESS ENTRIES AND PHOTOGRAPHIC COPIES. (a) Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible as evidence of the act, transaction, occurrence or event, if the trial judge finds that it was made in the regular course of any business, and that it was the regular course of the business to make the writing or record at the time of the act, transaction, occurrence or event or within a reasonable time thereafter."

August 6, 1984, and gave a five page written state-
ment. On August 8, 1984, Torres returned to the police
station to correct a number of misstatements made in
his earlier written statement.[3] The police arrested
Torres for providing them with a false statement. Sub-
sequently, Torres was placed on accelerated rehabili-
tation pursuant to General Statutes § 54-56e.[4]

---

[3] Torres returned to the police station to correct his statement because
his girlfriend had given a statement to the police on August 7, 1984, which
conflicted with Torres' August 6, 1984 statement with regard to several
aspects. Torres discovered the conflicting account given by his girlfriend
when she arrived home.

[4] General Statutes (Rev. to 1985) § 54-56e provides: "(Formerly Sec.
54-76p). ACCELERATED PRETRIAL REHABILITATION. There shall be a pre-
trial program for accelerated rehabilitation of persons accused of a crime,
not of a serious nature. The court may, in its discretion, invoke such program
on motion of the defendant or on motion of a state's attorney or prosecuting
attorney with respect to an accused who, the court believes, will probably
not offend in the future and who has no previous record of conviction of
crime and who states under oath in open court under the penalties of per-
jury that he has never had such program invoked in his behalf, provided
the defendant shall agree thereto and provided notice has been given by
the accused, on a form approved by rule of court, to the victim or victims
of such crime, if any, by registered or certified mail and such victim or vic-
tims have an opportunity to be heard thereon. This section shall not be appli-
cable to any person charged with a violation of section 14-227a, 53a-56b
or 53a-60d. Unless good cause is shown, this section shall not be applicable
to persons accused of a class A, class B, or class C felony or to any youth
who has previously been adjudged a youthful offender under the provisions
of sections 54-76b to 54-76n, inclusive. Any defendant who enters such pro-
gram shall agree to the tolling of any statute of limitations with respect
to such crime and to a waiver of his right to a speedy trial. Any such defend-
ant shall appear in court and shall be released to the custody of the office
of adult probation for such period, not exceeding two years, and under such
conditions as the court shall order. If the defendant refuses to accept, or,
having accepted, violates such conditions, his case shall be brought to trial.
If such defendant satisfactorily completes his period of probation, he may
apply for dismissal of the charges against him and the court, on finding
such satisfactory completion, shall dismiss such charges. If the defendant
does not apply for dismissal of the charges against him after satisfactorily
completing his period of probation, the court, upon receipt of a report sub-
mitted by the office of adult probation that the defendant satisfactorily com-
pleted his period of probation, may on its own motion make a finding of
such satisfactory completion and dismiss such charges. Upon dismissal, all
records of such charges shall be erased pursuant to section 54-142a."

At trial, defense counsel twice attempted to introduce into evidence the fact of Torres' arrest. Each time the court sustained the state's objection to the defendant's questions and specifically directed the jury to disregard the questions. The defendant argues that evidence of Torres' arrest was admissible as: (a) "evidence tending to show that another committed the crime [in question]"; and (b) "evidence reflecting consciousness of guilt." Consequently, the defendant argues that "the jury was not provided with all the necessary facts for it to render an accurate verdict." We disagree.

## A

Recently, in *State* v. *Echols,* 203 Conn. 385, 392–93, 524 A.2d 1143 (1987), we had occasion to review fully the applicable principles of law governing the admissibility of evidence which tends to show that a third party may have committed the crime with which a defendant has been charged. We held that "a defendant may introduce evidence which indicates that a third party, and not the defendant, committed the crime with which the defendant is charged. . . . The defendant, however, must show some evidence which directly connects a third party to the crime with which the defendant is charged. . . . It is not enough to show that another had the motive to commit the crime . . . nor is it enough to raise a bare suspicion that some other person may have committed the crime of which the defendant is accused. . . ." Id., 392. Other than the fact that Kennedy was apparently on her way to visit Torres when she was killed, there was not the slightest bit of evidence that connected Torres with her murder. Under the circumstances the trial court did not err in excluding from evidence the fact of Torres' arrest for providing a false statement.

"The presentation and admissibility of such evidence is governed by the rules of relevancy. . . . We have

often stated that '[e]vidence is admissible when it tends to establish a fact in issue or to corroborate other direct evidence in the case. . . . "One fact is relevant to another fact whenever, according to the common course of events, the existence of the one, taken alone or in connection with other facts, renders the existence of the other either certain or more probable. . . ." ' " (Citations omitted.) Id., 393. A trial court's ruling on the relevancy of such evidence will be reversed only if the court has abused its discretion or an injustice appears to have been done. Id.

While evidence of Torres' arrest on the charge of providing a false statement to the police may have had some bearing on his credibility as a witness, the fact of arrest was not relevant to bolster the defendant's unsupported allegation that Torres committed the murder with which the defendant was charged. Furthermore, this court has held that evidence of an arrest in the absence of a conviction is generally not admissible even to attack credibility. *State* v. *Moynahan,* 164 Conn. 560, 600, 325 A.2d 199, cert. denied, 414 U.S. 976, 94 S. Ct. 291, 38 L. Ed. 2d 219 (1973); see also 20 A.L.R.2d 1421, 1425, § 3.

Moreover, the trial court placed no restrictions on the defendant's cross-examination of Torres as it related to the inaccuracies contained in his August 6, 1984 statement to the police. Defense counsel fully explored each and every misstatement by Torres, and, in fact, Torres admitted numerous times during his testimony that he had lied to the police on August 6, 1984. The jury therefore was provided with a sufficient foundation on which to judge his credibility or lack thereof. Under these circumstances, we find that the trial court did not abuse its discretion in excluding from evidence the fact of Torres' arrest.

## B

The defendant also claims that evidence of Torres' arrest was admissible as "evidence reflecting a consciousness of guilt." We disagree.

This argument is contrary to our holding above for it assumes that Torres' arrest, in and of itself, was relevant to the defendant's claim that Torres had committed the murder in question. It was not. In addition, the defendant's argument misconstrues the rule of evidence relating to the admissibility of false statements that reflect a consciousness of guilt. We have held that misstatements of *an accused,* which a jury could reasonably conclude were made in an attempt to avoid detection of a crime or responsibility for a crime or were influenced by the commission of the criminal act, are admissible as evidence reflecting a consciousness of guilt. This rule has only been applied, however, where the declarant of the *misstatement has been the defendant.* See *State* v. *Thomas,* 205 Conn. 279, 287, 533 A.2d 553 (1987); *State* v. *Banks,* 194 Conn. 617, 621–22, 484 A.2d 444 (1984); *State* v. *Maturo,* 188 Conn. 591, 597–98, 452 A.2d 642 (1982); *State* v. *DeMatteo,* 186 Conn. 696, 702–703, 443 A.2d 915 (1982); *State* v. *Moynahan,* supra, 595–96. It has not been utilized to demonstrate a consciousness of guilt on the part of a third party who has not been shown to have any connection with the crime. Thus, we find no error in the trial court's having excluded the fact of Torres' arrest from evidence.

## II

The defendant next claims that the trial court erred in admitting into evidence the hearsay statement of an anonymous phone caller, which was contained in the police report of Detective Terry Blair and admitted as

a "business record" under General Statutes § 52-180. Specifically, the defendant argues that the record was not admissible because there had been no evidence presented to indicate that the caller had a business duty to report the information to the Hartford police department.

In response to the admission of a copy of an August 4 police report of Detective Ocell Blocker,[5] the state recalled Blair to testify solely for the purpose of admitting his August 7 one page report. Over defense counsel's objections, the trial court admitted the report into evidence as a "business record" under § 52-180 and the following portion was read to the jury: "Date of incident, 8-07-84; time of incident 0830; date reported, 8-07-84; time reported, 0830; number 50 Jennings Road, Hartford, CT., case number 84-32562.

"On this date and time, this detective received a phone call from someone, anonymous, stating that on Saturday morning he heard a woman yelling, 'Help me, Robert, help me.' This detective then tried to talk to the caller who stated thank you and hung up."

The defendant argues that the trial court erred in admitting the "Help me, Robert, help me" portion of the detective's report because it was hearsay and did not fall within the business record exception because the state failed to show that the caller had a business duty to report the information to the police. The state conceded that the trial court erred in admitting this portion of Blair's report. Nevertheless, the state argues that the defendant has failed to demonstrate that the court's error resulted in any prejudice. The state claims,

_____

[5] The trial court admitted into evidence a one page police report made by Detective Ocell Blocker. The report indicated that an anonymous male called the police station and indicated that he had heard a woman scream, "Robert, no, no, Robert, no no." Neither party challenged the admission of this report on appeal.

therefore, that the defendant has not met his burden and, consequently, has failed to provide any ground for reversing his conviction. We agree.

"To be admissible under the business record exception of General Statutes § 52-180, 'the business record must be one based upon the entrant's own observations or upon information transmitted to him by an observer whose business duty it was to transmit it to him.' *D'Amato* v. *Johnston,* 140 Conn. 54, 59, 97 A.2d 893 (1953). Statements obtained from volunteers are not admissible though included in a business record because it is the duty to report in a business context which provides the reliability to justify this hearsay exception. Id. Information in a business record obtained from a person with no duty to report is admissible only if it falls within another hearsay exception. *State* v. *Palozie,* 165 Conn. 288, 295, 334 A.2d 468 (1973)." *State* v. *Sharpe,* 195 Conn. 651, 663–64, 491 A.2d 345 (1985).

Under the circumstances of this case, the trial court erred in admitting the hearsay statements contained in Blair's report because the identity of the caller was unknown, thus preventing a determination as to whether it was the caller's business duty to report such information. Where, however, an evidentiary ruling has been found to be erroneous but the error does not implicate a constitutional right of the defendant, the burden rests upon the defendant to establish the harmfulness of the error. *State* v. *Boucino,* 199 Conn. 207, 225, 506 A.2d 125 (1986); *State* v. *Vitale,* 197 Conn. 396, 403, 497 A.2d 956 (1985); *State* v. *Ruth,* 181 Conn. 187, 196–97, 435 A.2d 3 (1980).

At trial, defense counsel stated several reasons why Blair's report did not qualify as a business record but failed to note any harm or prejudice that might have resulted from its admission. In fact, defense counsel's arguments indicate the contrary. In opposition to the

admission of the report he argued that, in light of the evidence the state had already presented, the admission of the report was not necessary for a resolution of the case. This clearly demonstrates the relative lack of importance that the statement in Blair's report had in the defendant's eyes. It must also be noted that the defendant failed to brief the issue of prejudice or harm, nor did he point to any evidence from which one might reasonably infer that the defendant was harmed by the court's ruling. We note that the trial lasted approximately seven and one-half weeks and generated almost 3500 pages of trial transcripts. Approximately eighty exhibits were received into evidence and almost sixty more were marked for identification and referred to during the trial. It is difficult to perceive that the admission of this one page report, which contained an objectionable five word phrase, prejudiced the defendant as claimed.

Additionally, Blair's report indicates nothing more than that an unknown person may have heard a woman "yelling" at some time on a Saturday morning, presumably the morning of August 4, 1984, "Help me, Robert, help me." The inferences that can be drawn from the report are numerous, particularly in light of the various accounts of what the victim allegedly screamed at 5 o'clock that morning. Detective Blocker's report, which the defendant had admitted as an exhibit, indicates that an anonymous male caller heard a woman scream, "Robert, no, no, Robert, no no." Blocker also testified that other phone calls were received from people who stated they heard the victim scream, "no, robber, no, robber." Numerous other witnesses testified they heard screams only and no specific words. Another witness testified that she heard a woman cry, "Help, help, police, police, robber, robber." Yet another witness stated that she heard, "Help me, somebody help me." In view of the confusion as to what was said, it

is unlikely that the jury would have placed any weight on what the anonymous caller reported to Blair.

Accordingly, we conclude that the erroneous admission of Blair's one page report was harmless error.

## III

The defendant next claims that the trial court impermissibly restricted the scope of his cross-examination of Yvette Gonzalez in violation of his right to confrontation guaranteed by the sixth amendment to the United States constitution. Specifically, the defendant contends that he should have been able to probe more deeply into the circumstances of Gonzalez' pretrial photographic identification in order to determine the basis and reliability of her in-court identification of the defendant.

During the trial, the defendant moved to suppress a photographic identification that had been made by Gonzalez prior to trial. Gonzalez' testimony revealed that at approximately 9 p.m., on August 1, 1984, she was walking on Asylum Avenue in Hartford when she was approached by a black male whom she described as being approximately six feet two inches tall with a slim build. The assailant pointed a "double o' seven" knife at her neck, asked her for her money and then told her to take her clothes off.[6] Thereafter, a third person appeared and the assailant fled. Gonzalez did not report the incident until August 7, 1984, when she was approached on the corner of Collins Street and Sumner Street by two police officers who had been canvassing the neighborhood in search of information regarding the Kennedy murder. After Gonzalez described the August 1, 1984 incident, the police asked her to get into

---

[6] Gonzalez described the knife as being a large folding knife with a wooden handle and a straight blade. The blade was pointed at the end and smooth along the cutting edge, not serrated.

the police car. There they gave Gonzalez a stack of eight photographs from which she identified a picture of the defendant as that of her assailant. Gonzalez did not sign the back of the defendant's picture until reaching the police station after having been driven around in the police car for some four hours.

At the suppression hearing the defendant argued that the photographic identification was unnecessarily suggestive and unreliable. The trial court found to the contrary and denied the motion to suppress. During Gonzalez' testimony at trial she made an in-court identification of the defendant as her assailant. On cross-examination, defense counsel attempted to question her regarding the circumstances surrounding her photographic identification made in the police cruiser. Upon the state's objection, the trial court ruled as follows: "You may inquire whether or not that [in-court] identification may have been [a]ffected at all by her being presented with photographs so that she is now identifying the person shown in the photograph rather than a present recollection of the identity of the individual that night. To that extent I will let you go into the question of photographs." The defendant argues that such a restriction violated his sixth amendment right to confrontation.

"The Confrontation Clause of the Sixth Amendment [to the United States constitution] guarantees the right of an accused in a criminal prosecution 'to be confronted with witnesses against him.' . . . ' "[T]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." ' " (Emphasis omitted.) *Delaware* v. *Van Arsdall,* 475 U.S. 673, 678, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986). While " ' "[c]ross-examination is the principal means by which the believability of a witness and the truth [or reliability] of his testimony are tested[;] *Davis* v. *Alaska,* 415 U.S. 308, 316, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974);

*State* v. *Brigandi,* 186 Conn. 521, 533, 442 A.2d 927 (1982)[;]' " *State* v. *Milum,* 197 Conn. 602, 608, 500 A.2d 555 (1985); a defendant's right to cross-examination "is not absolute and is subject to reasonable limitation by the [trial] court." *State* v. *Thompson,* 191 Conn. 146, 147–48, 463 A.2d 611 (1983); see also *State* v. *Jackson,* 198 Conn. 314, 318–19, 502 A.2d 865 (1986); *State* v. *Vitale,* supra, 401. "The general rule is that restrictions on the scope of cross-examination are within the sound discretion of the trial judge. This discretion comes into play, however, only after the defendant has been permitted cross-examination sufficient to satisfy the sixth amendment. *State* v. *Castro,* 196 Conn. 421, 424, 493 A.2d 223 (1985); *State* v. *Gaynor,* 182 Conn. 501, 508, 435 A.2d 1022 (1980). The constitutional standard is met when defense counsel is permitted to expose to the jury the facts from which the jurors, as the sole triers of the facts and credibility, can appropriately draw inferences relating to the reliability of the witness. *United States* v. *Vasilios,* 598 F.2d 387, 389 (5th Cir. 1979), cert. denied, 444 U.S. 967, 100 S. Ct. 456, 62 L. Ed. 2d 380 (1979), reh. denied, 444 U.S. 1049, 100 S. Ct. 742, 62 L. Ed. 2d 737 (1980), and cert. denied sub nom. *Alexander* v. *United States,* 444 U.S. 932, 100 S. Ct. 277, 62 L. Ed. 2d 190 (1979); *State* v. *Castro,* supra, 425." *State* v. *Vitale,* supra, 402; see also *State* v. *Weidenhof,* 205 Conn. 262, 270, 533 A.2d 545 (1987); *State* v. *Milum,* supra, 609; *State* v. *Shindell,* 195 Conn. 128, 140, 486 A.2d 637 (1985); *State* v. *Asherman,* 193 Conn. 695, 718, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985).

In applying these principles to the case at hand, we conclude that the trial court violated the defendant's right to confrontation by unreasonably restricting the scope of his cross-examination of Gonzalez.

On direct examination at trial, Gonzalez testified that she was "very positive" that the defendant was the per-

son who, on August 1, had held a knife to her throat and told her to take off her clothes and to give him her money. No reference was made to the pretrial photographic identification of the defendant. On cross-examination, defense counsel gave Gonzalez the eight photographs used in her pretrial identification and began to question her about the circumstances under which the identification had been made. When the state objected, defense counsel argued that the circumstances surrounding the pretrial photographic identification were relevant to Gonzalez' credibility, to her identification, and to the reliability of her in-court identification. The trial court sustained the objection in part but allowed defense counsel to inquire as to whether the pretrial identification in any way affected Gonzalez' in-court identification.

Thereafter, the trial court allowed Gonzalez to testify on cross-examination that she was contacted on the corner of Collins Street and Sumner Street by the police on August 7, 1984, for purposes of viewing a photographic array. Most significantly, she testified that the photographs helped her identify the defendant in court. The trial court refused to allow defense counsel to cross-examine Gonzalez with regard to: (1) the reason(s) for the four hour delay between her identifying the photograph and her signing it; (2) whether the police had asked her to give a description of her assailant before or after viewing the photographs; (3) whether she was unable to give a facial description of the defendant until after viewing the photographs; (4) the reason(s) for not having reported the incident on her own prior to being approached by the police on August 7, 1984; and (5) why she had returned to the same street at 9 p.m. six days after her assault if she had been scared. The trial court also ruled that, because the issues regarding the suggestibility of the pretrial photographic identification and police coercion or duress

in connection with it had been fully explored during the suppression hearing, defense counsel should not inquire into those areas.[7]

The factors relevant to determining the reliability of an identification include, but are not limited to, the following: the opportunity of the witness to view the criminal at the time of the crime; the witness's degree of attention; the accuracy of her prior description of the criminal; the level of certainty demonstrated at the identification; the time between the crime and the identification; see *Manson* v. *Brathwaite,* 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); *State* v. *Mayette,* 204 Conn. 571, 583, 529 A.2d 673 (1987);[8] and the degree of contact or number of confrontations the witness had with the defendant prior to trial. See *State* v. *Gordon,* 185 Conn. 402, 418–19, 441 A.2d 119 (1981), cert. denied, 455 U.S. 989, 102 S. Ct. 1612, 71 L. Ed. 2d 848 (1982).

Accordingly, where, as here, an in-court identification of a defendant was allegedly aided or influenced by a pretrial photographic array, a defendant should be given sufficient latitude on cross-examination to

---

[7] The trial court ruled as follows: "I agree with counsel for the State that you should not go into those matters that relate to the identification process. All of that confrontation between this witness and the police and the claim of duress and the like of that, all of that has to do with the issue that we then heard with respect to the admissibility of that evidence as tested by a motion to suppress. There is, however, her statement on examination, direct examination, here in the presence of the jury that she is positive of the identification of the individual that night, and that the defendant is that individual. You may inquire whether or not that identification may have been affected at all by her being presented with photographs so that she is now identifying the person shown in the photograph rather than a present recollection of the identity of the individual that night. To that extent I will let you go into the question of photographs."

[8] While these factors listed are enumerated in our case law, specifically in the context of determining whether the identification procedures violated a defendant's due process rights, we find them relevant to our discussion of this issue.

expose to the jury the facts from which the jurors, as the sole triers of the facts, can appropriately weigh the reliability of the in-court identification. This was not permitted here. The trial court precluded defense counsel from inquiring into whether Gonzalez was ever asked by the police to give a description of the defendant prior to the pretrial photographic identification or whether she had been unable to describe the facial features of the defendant prior to the photographic identification.[9] Defense counsel was also precluded from seeking explanations from Gonzalez as to the reasons for the delay in signing the photograph and her failure to report the August 1, 1984 incident on her own to the police. Additionally, the court prohibited any cross-examination concerning the police procedures used that may have indicated any degree of coercion in obtaining the photographic identification.

While we agree with the trial court that the defendant should not be able to reargue the motion to suppress before the jury, the reliability of an in-court identification based at least in part on photographs supplied to the witness during a pretrial identification procedure is a matter for the jury to decide and is distinct from the issue of the admissibility of the out-of-court photographic identification itself. Accordingly, we hold that the restrictions placed on the defendant's cross-examination of Gonzalez did not comport with constitutional standards and thus violated the defendant's right to confrontation guaranteed by the sixth amendment.

This does not conclude our inquiry, however, because the erroneous refusal to permit proper cross-examination of the state's witness, while violative of the defendant's sixth and fourteenth amendment guarantees of confrontation, does not require an automatic reversal.

---

[9] Gonzalez' testimony on these two issues during the suppression hearing was unclear and at times contradictory.

*United States* v. *Christian,* 786 F.2d 203, 212–13 (6th Cir. 1986). "The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. Cf. [*Harrington* v. *California,* 395 U.S. 250, 254, 89 S. Ct. 1726, 23 L. Ed. 2d 284 (1969)]; *Schneble* v. *Florida,* 405 U.S. [427, 432, 92 S. Ct. 1056, 31 L. Ed. 2d 340 (1972)]." *Delaware* v. *Van Arsdall,* supra, 684; *State* v. *Ortiz,* 198 Conn. 220, 224–26, 502 A.2d 400 (1985). For identification cases see *United States* v. *Owens,* 789 F.2d 750, 762 (9th Cir. 1986), cert. granted, 479 U.S. 1084, 107 S. Ct. 1284, 94 L. Ed. 2d 143 (1987); *United States* v. *Jarrad,* 754 F.2d 1451, 1456–57 (9th Cir. 1985), cert. denied sub nom. *McManamy* v. *United States,* 474 U.S. 830, 106 S. Ct. 96, 88 L. Ed. 2d 78 (1985); *Stewart* v. *Cowan,* 528 F.2d 79, 82 (6th Cir. 1976); *Gaines* v. *Thieret,* 665 F. Supp. 1342, 1351–53 (N.D. Ill. 1987); *Burns* v. *Clusen,* 599 F. Supp. 1438, 1448–50 (E.D. Wis. 1984), aff'd, 798 F.2d 931 (7th Cir. 1986).

Upon a review of the extensive record before this court we conclude that the restrictions placed on the cross-examination of Gonzalez, while error, were harmless beyond a reasonable doubt. Gonzalez' identification testimony related to an assault on August 1, 1984. Although somewhat factually similar, it was nevertheless a separate and distinct incident from the Kennedy

murder. Gonzalez' trial testimony, therefore, did not directly implicate the defendant in the Kennedy murder which did not occur until three days after the assault on Gonzalez. Additionally, defense counsel was able to elicit from Gonzalez on cross-examination that: (1) she did not report the incident until six days after it had occurred and then only after she had been approached by the police; (2) she had not viewed a lineup; (3) she was afraid of the defendant; and (4) she had seen the photographs a number of times prior to testifying. She also admitted that the photographs helped her to identify the defendant in court. Although these facts are not as complete as they might have been if the court had not restricted cross-examination, they did provide a fair basis for the jury to draw reasonable inferences regarding the reliability or lack thereof of Gonzalez' in-court identification.

Even if we assume that the jury credited the identification as reliable and relevant, it was, nevertheless, cumulative in light of the evidence that directly implicated the defendant in the Kennedy murder. Susie Jackson identified the defendant in a pretrial photographic array and then identified him in court as the man who had propositioned her at approximately 4:15 a.m. on August 4, 1984, at the corner of Garden and Collins streets. She specifically described the defendant as wearing a red tee shirt and fitted blue jeans that had a nice crease in them. She also testified that when the defendant turned to walk away from her she saw "what looked to have been a knife in his right-hand back pocket." Paul Cooper, who had been standing across the street and specifically observing the defendant with Jackson, identified the defendant in court and in a pretrial photographic array as the one who resembled the man who spoke with Jackson. Cooper described the defendant as being a young black male approximately

six feet one inch to six feet two inches tall who was wearing a red tee shirt and blue trousers.

Laurie Philbrick testified that she had been approached at about 4:30 the same morning by a tall, thin black man while she had been sitting on the front steps of her apartment building at 73 Sumner Street. The man, whom she had identified as the defendant from a photographic array, approached her from the direction of Collins Street and offered her money to engage in oral sex with him. She took him up to her apartment and at one point, the defendant reached into one of his rear pockets and said something that caused Philbrick to believe that he was going to hurt her. She screamed for her boyfriend who came running in from the kitchen. At that moment the defendant fled the apartment and exited the building by a door that led to the rear parking lot. Philbrick described the defendant as being six feet three inches tall, not well shaven, and as having a short afro. She also described the defendant as having worn a red short sleeved tee shirt with blue jeans. Philbrick also indicated that the defendant appeared to be very nervous and she thought that he "was looking to hurt somebody seriously." Thereafter, she testified that approximately five minutes after the defendant had fled from her apartment she and her boyfriend heard loud screams outside.

William Campbell was on Collins Street that morning and had heard the screams coming from the vicinity of the Sumner Street and Collins Street intersection. He ran in the direction of the screams and upon arriving at the parking lot behind 87/89 Sumner Street he observed a man standing behind a naked woman who was kneeling on the ground holding her stomach. Campbell described the man as being a six feet one inch tall black male who was wearing a short sleeved red

or maroon tee shirt and jean pants. He also testified that the man ran away in the direction of Asylum Street.

Barbara Floyd then testified that, upon hearing the screams, she proceeded down a driveway toward the parking lot when a man in a red tee shirt ran by her. She described this man as being black and about six feet tall. When she arrived at the parking lot and saw the victim, she then ran to the street, stopped Henry Ellis who was driving by on Sumner Street and informed him that a girl had been stabbed. Ellis gave chase in his car up Collins Street and then Garden Street and followed the assailant through a parking lot where the assailant entered a door on the back of a building on Asylum Street with a key. Ellis described the man he had chased as having short hair and wearing dungarees and a red short sleeved tee shirt. Ellis identified the defendant in a pretrial photographic array and in court as the man he had chased. Additionally, he testified that he had known the defendant previously because he had gambled with him on a number of occasions.

The defendant was also seen and identified by Carolyn Hatchett. Hatchett testified that shortly after the screams the defendant ran past her on Huntington Street. She described the defendant as wearing a red short sleeved tee shirt, blue jeans and "carrying a shiny object in his hand." The photograph from which she identified the defendant was admitted into evidence.

In addition to the identification testimony above, three workers of the Hartford Insurance Company were on a rooftop nearby when they heard the screams at approximately 5 a.m. Each testified that, after they heard the screams, they saw a black or hispanic man run onto Sumner Street from a driveway between two buildings toward Collins Street and then toward Garden Street. Two of the three described the man as being

over six feet tall, slender, in his mid-twenties, medium to dark complexion, and was wearing jeans and a "cranberry" colored tee shirt.

Accordingly, we find that, in light of the evidence, the restrictions placed upon the cross-examination of Gonzalez by the trial court, while violative of the defendant's sixth amendment right to confrontation, nevertheless, were harmless beyond a reasonable doubt.

## IV

The defendant next claims that the trial court erred in denying his motion to suppress Cooper's pretrial photographic identification. Specifically, the defendant argues that the police procedures used to obtain the identification were unnecessarily suggestive and that the identification itself was inherently unreliable. Consequently, he argues that the admission of Cooper's pretrial identification testimony violated his right to due process.

A review of the transcripts concerning this issue reveal the following facts. At approximately 4:15 in the morning, on August 4, 1984, Cooper left Susie Jackson on the corner of Collins and Garden streets and crossed the street. At that point, he saw a six foot one inch to six foot two inch tall black man wearing a red tee shirt and blue trousers walking behind Jackson, and Cooper stopped to observe. He saw the two engage in conversation for a few minutes, after which the man departed.

On August 8, 1984, two plainclothes police officers went to Jackson's house and asked her and Cooper to come down to the police car. There Cooper viewed approximately six photographs from which he chose two as looking like the man he had seen.[10] He was

---

[10] Cooper's testimony at the suppression hearing is confusing and would lead one to believe that it was during the August 10, 1984 photographic

not asked to sign either of them. Subsequently, on August 10, 1984, Jackson and Cooper were picked up by two Hartford police detectives and brought to police headquarters. There they were taken into separate rooms where they gave statements to the police and again viewed photographic arrays. Cooper was given a stack of seven photographs from which he chose the defendant's photograph again as only looking like or resembling the man who had conversed with Jackson. After so identifying the defendant's photograph, Cooper signed the back of it.

The defendant contends that Cooper's August 10, 1984 photographic identification of the defendant was unnecessarily suggestive on two grounds. First, that it was presumptively suggestive because the defendant's picture recurred in the August 8, 1984 and the August 10, 1984 arrays that were shown to Cooper. Second, that the failure of the police to sequester the potential witnesses from each other while they were waiting to be questioned on August 10, 1984, at police headquarters tainted Cooper's subsequent identification.

At the outset we note that " '[i]n order to suppress evidence of an identification derived from allegedly unconstitutional procedures, a criminal defendant bears the burden of proving that the identification procedures were unnecessarily suggestive, and, if so, that the resulting identification was unreliable in the totality of the circumstances.' State v. Williams, 203 Conn. 159, 173–74, 523 A.2d 1284 (1987); State v. Miller, 202 Conn. 463, 470, 522 A.2d 249 (1987). This burden requires the defendant to show that the challenged procedure ' "give[s] rise to a very substantial likelihood

array at the police station that he chose two photographs but his trial testimony clearly indicates to the contrary and is corroborated by the testimony of Detective Kurt Wolf.

of irreparable misidentification." ' *State* v. *Fullwood,* 193 Conn. 238, 243–44, 476 A.2d 550 (1984); *State* v. *Ramsundar,* 204 Conn. 4, 11, 526 A.2d 1311 (1987)." *State* v. *Boscarino,* 204 Conn. 714, 725–26, 529 A.2d 1260 (1987); see also *State* v. *Pollitt,* 205 Conn. 132, 162, 531 A.2d 125 (1987). Under the facts of this case the defendant has failed to demonstrate that the pre-trial identification procedures employed by the police were unnecessarily suggestive. It must be kept in mind that this is not a situation where a subsequent photographic array resulted in either an identification being made where one had not previously been made, or a subsequent identification was made with a higher degree of certainty because of the recurrence.

This court has consistently held that, " '[a]lthough "we have recognized that pictorial recurrence can be suggestive in that it increases the risk of misidentification"; *State* v. *McKnight,* 191 Conn. 564, 572, 469 A.2d 397 (1983); *State* v. *Ledbetter,* 185 Conn. 607, 613, 441 A.2d 595 (1981); see *Simmons* v. *United States,* 390 U.S. 377, 383, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968); the recurrent use of a defendant's photograph in successive arrays is not presumptively suggestive.' *State* v. *Boucino,* 199 Conn. 207, 219, 506 A.2d 125 (1986); *United States* v. *Bowie,* 515 F.2d 3, 7–8 (7th Cir. 1975); *State* v. *Evans,* 200 Conn. 350, 354–55, 511 A.2d 1006 (1986); *State* v. *Hinton,* [196 Conn. 289, 294, 493 A.2d 836 (1985)]." *State* v. *Mayette,* 204 Conn. 571, 581–82, 529 A.2d 673 (1987); see also *State* v. *Williams,* supra, 175–76. "Recurring photographs taint an identification procedure only when, in the context of the entire array, the recurrence unnecessarily emphasizes the defendant's photograph." *State* v. *Williams,* supra.

The defendant has failed to point to any place in the record that indicates that the procedures utilized on either August 8 or August 10 unnecessarily emphasized the defendant's photograph or were, in any way, inher-

ently suggestive. In fact, the record indicates the contrary. Cooper testified at the suppression hearing and at trial that the police did not highlight a specific picture in any way nor did they give him specific instructions when viewing the photographs. Detective Wolf testified that he had merely asked Cooper to look at all the photographs and that he did not make any gestures or suggestions regarding any of them. Cooper was given a stack of six to eight photographs each day and the defendant's photograph was not on the top of the pile either time. On both occasions Cooper selected the defendant's photograph and identified it only as resembling the man he had seen in complexion, height, size and hair style. This is not a situation where a witness was repeatedly shown the defendant's photograph until he picked out the highlighted suspect. The witness had already selected the defendant's photograph as resembling the man he had seen. Cooper was merely shown the picture selected two days earlier in a different setting to see if he remained constant in his identification. He was, in exactly the same degree. We cannot find that under these circumstances the recurrent use of the defendant's photograph rendered the August 10, 1984 pretrial photographic identification "unnecessarily suggestive" so as to require its suppression at trial.[11]

---

[11] Even if we assume, arguendo, that the Cooper identification resulted from unnecessarily suggestive procedures and the defendant was able to demonstrate the identification was also unreliable, we would, nevertheless, find the erroneous admission of Cooper's identification testimony to constitute harmless error beyond a reasonable doubt in light of the extensive identification evidence otherwise presented that we have previously outlined in detail. See *Rose* v. *Clark,* 478 U.S. 570, 578–79, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986); *Moore* v. *Illinois,* 434 U.S. 220, 232, 98 S. Ct. 458, 54 L. Ed. 2d 424 (1977), on remand, 577 F.2d 411 (7th Cir. 1978), cert. denied, 440 U.S. 919, 99 S. Ct. 1242, 59 L. Ed. 2d 471 (1979); *Gilbert* v. *California,* 388 U.S. 263, 273–74, 87 S. Ct. 1951, 18 L. Ed 2d 1178 (1967); *State* v. *Gordon,* 185 Conn. 402, 420–21, 441 A.2d 119 (1981), cert. denied, 455 U.S. 989, 102 S. Ct. 1612, 71 L. Ed. 2d 848 (1982); *State* v. *Packard,* 184 Conn. 258, 269 n.5, 439 A.2d 983 (1981); *State* v. *Oliver,* 161 Conn. 348, 357, 288 A.2d 81 (1971).

The defendant also argues that Cooper's pretrial identification was tainted by alleged discussions between Cooper and other witnesses that occurred on August 10, 1984, prior to Cooper's second viewing of a photographic array. We disagree. Cooper testified that on August 10 he was taken to police headquarters, along with Susie Jackson, by two detectives. Upon arrival, he recalled only that he and Jackson were taken to separate rooms where he gave a statement and viewed the photographic array. Henry Ellis, however, testified that at some point during the investigation, although it is not clear when, a number of the possible witnesses including Cooper were placed in the same room and had some discussions regarding the Kennedy murder. The defendant, however, has pointed to no evidence in the record to suggest that Cooper's photographic identification was in any way aided by any discussions that may have taken place. While the failure of the police to sequester potential witnesses invites an exchange of information that could taint a subsequent identification, the failure to sequester does not render a subsequent identification impermissibly suggestive where, as here, there is nothing that even suggests that Cooper's identification was influenced by any discussions that may have occurred. See *State* v. *Boscarino,* supra, 732.

Because the defendant has failed to demonstrate that the photographic identification of the defendant by Cooper resulted from unnecessarily suggestive procedures, we need not analyze the reliability of the identification. *State* v. *Boscarino,* supra; *State* v. *Miller,* supra; *State* v. *Amarillo,* 198 Conn. 285, 294, 503 A.2d 146 (1986). Accordingly, we find that the trial court did not err in denying the defendant's motion to suppress Cooper's pretrial photographic identification of the defendant.

## V

The defendant's final claim is that his sixth amendment right to effective assistance of counsel and his fourteenth amendment right to due process were violated by the state's "open file policy." Specifically, the defendant argues that under such policy he was only entitled, in lieu of filing specific discovery requests, to review the state's file and was precluded from transcribing any of his findings. Additionally, he argues that the state's file was incomplete and missing certain exculpatory items. He argues that, consequently, he was deprived of his right to proper discovery and thus his rights to effective counsel and due process were violated. We disagree.

In February, 1985, defense counsel filed a general request for disclosure of exculpatory material in the possession of the state. In response, the state permitted defense counsel, upon the scheduling of an appointment(s), to review the state's entire file. Sometime thereafter defense counsel reviewed the file and some materials were turned over to the defendant. In addition, there was material in the file which the state would not agree to turn over to the defendant. By agreement this material was placed in an envelope and presented to the court for an in camera hearing and judicial determination as to whether it was disclosable as exculpatory material, pursuant to General Statutes § 54-86c (b).[12]

Prior to trial, the court held a hearing at which time defense counsel was provided with copies of the mate-

[12] General Statutes § 54-86c (b) provides: "DISCLOSURE OF EXCULPATORY INFORMATION OR MATERIAL. . . .

"(b) Any state's attorney, assistant state's attorney or deputy assistant state's attorney may request an ex parte in camera hearing before a judge, who shall not be the same judge who presides at the hearing of the criminal case if the case is tried to the court, to determine whether any material or information is exculpatory."

rials submitted to the court. The court took up each item separately and both parties were permitted to argue their respective positions as to the disclosure. The trial court ruled on each item, to which rulings the parties took the appropriate exceptions. In addition, throughout the trial numerous requests for additional exculpatory material were made by defense counsel which resulted in additional disclosure.

## A

### DUE PROCESS

It is well settled that a violation of due process occurs where the prosecution fails to disclose to defense counsel requested exculpatory or *Brady* materials. *United States* v. *Agurs,* 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976); *Brady* v. *Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *State* v. *Baker,* 195 Conn. 598, 609, 489 A.2d 1041 (1985); *State* v. *Cohane,* 193 Conn. 474, 495, 479 A.2d 763 (1984), cert. denied, 469 U.S. 990, 105 S. Ct. 397, 83 L. Ed. 2d 331 (1984). Where, as here, a general request for exculpatory materials had been made, the burden is on the defendant to establish that the failure to disclose is a denial of due process. *State* v. *Doolittle,* 189 Conn. 183, 197, 455 A.2d 843 (1983). In order to meet this heavy burden, the defendant at a minimum must demonstrate: (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that it was material.[18] *United States* v. *Bagley,* 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985); *Moore* v. *Illinois,* 408 U.S. 786, 794–95, 92 S. Ct. 2562, 33 L. Ed. 2d 706, reh. denied, 409 U.S. 897, 93 S. Ct. 87, 34 L. Ed. 2d 155 (1972); *State* v. *Pollitt,* 205 Conn. 132,

[18] "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States* v. *Bagley,* 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985).

142–43, 531 A.2d 125 (1987); *State* v. *Baker,* supra; *State* v. *Green,* 194 Conn. 258, 263, 480 A.2d 526 (1984), cert. denied, 469 U.S. 1191, 105 S. Ct. 964, 83 L. Ed. 2d 969 (1985).

Under the circumstances of this case, the defendant has failed to present any evidence to demonstrate that the "open file policy" violated his rights to due process by precluding the discovery of exculpatory material. At the outset, we note that the defendant voluntarily agreed to accept the "open file policy." Under this policy the defendant's counsel had access to the state's entire file for approximately five months prior to the start of the trial. No restrictions were placed upon the number of times he was permitted to review that file. Defense counsel was permitted to mark material where he and the state's attorney were not in agreement regarding the exculpatory nature of the material. Thereafter defense counsel was given copies of these materials for purposes of argument at the in camera hearings held prior to trial, pursuant to General Statutes § 54-86c (b).

The defendant argues that he was precluded by the open file policy from filing specific requests for disclosure. That claim, however, is not supported. In fact, the record is to the contrary. The court file contains a supplemental motion for production and discovery dated February 22, 1985, which was filed but never ruled upon and apparently never pursued. In addition, throughout the trial, defense counsel made numerous oral motions for alleged exculpatory materials as they came to light. The trial court took up these matters when presented and ordered disclosure in response to those motions when appropriate.

The defendant also argues that he was deprived of a fair trial because the state's file failed to contain the following items during his initial review because they

had been either lost or misplaced: a Hartford police department tape recording; reports of Dr. Abraham Stolman; a package of Newport cigarettes; and a June, 1985 letter of Carl Blair. First, we note that a copy of the tape recording and the additional reports of Stolman were turned over by the state as soon as the state became aware of their existence. The package of Newport cigarettes was lost, but a photograph of it was admitted into evidence at trial and testimony indicated that no latent fingerprints had been found on it previously. While the letter of Carl Blair was never found, the defendant has offered no evidence to indicate that the subject matter of the letter was exculpatory or that the letter had ever become part of the state's file. In addition, Blair testified at trial regarding the letter and was subject to cross-examination. We also find the defendant's claim, that he was deprived of a fair trial because the state did not disclose Carl Blair as a witness prior to the day of his testimony, to be meritless. The record clearly indicates that the state erroneously named him Brooks in its witness list and did not discover the mistake until the day Blair was to testify. In addition, the trial court recessed to provide defense counsel an opportunity to interview Blair prior to his testimony.

Under the circumstances it is clear that the defendant has failed to demonstrate a violation of his rights to due process.

B

Sixth Amendment

The defendant's final argument is that the "open file policy" hindered defense counsel's ability to represent him in violation of his sixth amendment right to effective assistance of counsel. We decline to review this claim because the defendant has failed to formulate any reasoned legal argument and has failed to cite any

542

authority in support of his claim. See *State* v. *Hernandez,* 204 Conn. 377, 382, 528 A.2d 794 (1987). The claim encompasses the final sentence of the defendant's brief and amounts to no more than an unsupported assertion. Under such circumstances, we decline to review this claim.

There is no error below that requires reversal of the defendant's conviction.

In this opinion the other justices concurred.