[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
On February 20, 1991, the petitioner, Clinton Milner sought a writ of habeas corpus from this court. On February 18, 1997, the petitioner filed an amended petition and on November 11, 1997, the petitioner filed a Revised Amended Petition. On January 16, January 22, and May 28, 1998, this matter was tried to the court. On January 22, 1998, the petitioner filed a motion requesting an order of the court that all forensic evidence be forwarded to the Chief Medical Examiner for testing. The court entered such an order on January 22, 1998.
On October 29, 1998, the petitioner filed a Motion for Leave to File Third Revised Amended Petition claiming that despite the timing of the request, the court under its "broad and unfettered equitable power and discretion" should permit the requested amendment. The petitioner cites General Statutes § 42-470[1] as authority. The respondent opposed the granting of the request for leave to amend. The court hereby grants the petitioner's request and allows the amendment based upon the guidelines set forth in Moore v. Sergi, 829, 664 A.2d 795 (1995).
The amended petition claimed that the state failed to conduct tests on blood found in Torres apartment to see if it came from the victim. The proposed amended petition adds the claim that the state failed to conduct additional tests on blood found on the victim's clothing and on scrapings from under the victim's nails to see if it came from Torres. In both instances, the petitioner claims that isoenzyme testing should have been done. The majority of the facts in this habeas proceeding are premised upon the transcript of the criminal trial, Petitioner's Exhibit U. The facts brought out in the habeas hearing, that are relevant to the petitioner's amendment, are the results of DNA testing and general information concerning isoenzyme testing. The petitioner seeks to amend his petition based upon the application of that information to the facts brought out at the criminal trial. The court finds that the respondent would not be prejudiced by the amendment conforming the allegations to the facts set out in the criminal trial and habeas hearing. Thus, the court finds that the amendment should be allowed.
The petitioner's third amended petition alleges in the first count that the law enforcement laboratories failed to conduct certain blood tests that would have been exculpatory and would have shown someone other than the petitioner as the perpetrator. The second count alleges that the police lost certain evidence CT Page 13603 that would have assisted the petitioner in his defense. The third count claims that certain DNA tests, which were not available at the time of the petitioner's criminal trial, would produce new evidence that the petitioner was in fact innocent of the crime.[2] The fourth count alleges that the state failed to preserve and maintain the bloodstain evidence after the trial for future DNA testing thus depriving the petitioner of exculpatory evidence.[3] Finally, in the fifth count, the petitioner claims that defense counsel failed or refused to allow the petitioner to testify at his criminal trial; thus depriving him of his right to present testimony on his own behalf. While it is unclear from the petition, the court assumes the petitioner is alleging "ineffective assistance of counsel" only on the fifth count of the petition and violations of state and federal due process guarantees on counts one through three.[4]
On October 15, 1985, the petitioner was convicted of murder in violation of General Statutes § 53a-54a after a jury trial. On November 25, 1985, the trial court, Dorsey, J., sentenced the petitioner to a term of imprisonment for life. At the trial, the petitioner was represented by Attorney Carmine Giuliano. The conviction was upheld on appeal, State v. Milner,206 Conn. 512, 539 A.2d 80 (1988). The petitioner is presently in the custody of the commissioner of correction serving that sentence.
The Supreme Court set forth the facts that the jury could reasonably have found: "At approximately 5:00 a.m., on August 4, 1984, in response to loud screams emanating from a parking lot behind 87/89 Sumner Street in Hartford, approximately ten people rushed to the area and found Susan Kennedy naked, kneeling in a puddle of blood and holding her stomach. Her clothes and belongings were in a pile approximately twenty-five feet from the spot where she was kneeling. Kennedy was rushed to St. Francis Hospital and Medical Center where she was pronounced dead on arrival. An autopsy revealed that her death resulted from twelve stab wounds to the chest and abdomen which penetrated multiple organs.
Numerous witnesses placed the defendant at the scene of the crime or in its immediate vicinity while others observed him running away from Sumner Street. In addition, there was testimony indicating that he had been carrying a knife in the time frame immediately preceding Kennedy's murder. CT Page 13604
Subsequent to the murder, while the defendant was being held at the Hartford Correctional Center, he told a fellow inmate that he had grabbed the victim, dragged her to the back of an alley and put a knife to her chest. Additionally, he told another inmate that he had a chance of beating the case because of the lack of evidence. He indicated that, while the knife admitted into evidence was his, the state could not prove it, nor could they find the clothes he wore the morning of the murder."Id., 514.
The court will make additional findings of fact and conclusions of law where required.
Prior to analyzing the petitioner's claims contained in counts one and two, the court makes the following observation. Both of these claims involved alleged violations of the petitioner's due process rights. These claims may have been disposed of by applying the principles set forth in Johnson v.Commissioner, 218 Conn. 403, 589 A.2d 1214 (1991). The petitioner may have been subject to a defense of procedural default on both counts absent the requisite showing good cause and prejudice. However P.B. Sec. 23-30 requires the respondent to raise as a defense any procedural default in its reply. The respondent has not done so. See Medley v. Warden, Superior Court, judicial district of Tolland at Somers, Docket No. 1485 (August 10, 1993, Sferrazza, J.) (8 CSCR 937), affirmed,35 Conn. App. 374, 646 A.2d 242 (1994), reversed on other grounds,235 Conn. 413, 667 A.2d 549 (1995). Raising this defense would then place the burden on the petitioner to demonstrate that there was no procedural default. Johnson v. Commissioner, supra,218 Conn. 419. Therefore, the court will consider the petitioner's constitutional claims.
In count one of his petition, the petitioner claims that the failure by the state to do more specific blood tests deprived the petitioner of possible exculpatory evidence thus violating his due process rights. More specifically, the petitioner claims that the state should have conducted isoenzyme testing on blood found in Torres'[5] apartment as well as on blood on the victim's panties and jeans as well as blood that came from under the victim's fingernails. The petitioner claims that if isoenzyme testing had been done in a timely fashion that certain classes of individuals could have been excluded. The respondent asserts that there is no evidence before the court from either the habeas hearing or the criminal trial that demonstrated that CT Page 13605 additional testing would have brought forth exculpatory evidence.
The petitioner claims in count two of the October 27, 1998 amended petition that the state violated his due process rights by misplacing certain evidence,[6] specifically a package of Newport cigarettes. The respondent argues that there has been no demonstration by the petitioner as to how the unpreserved evidence was exculpatory.
Our Supreme Court has consistently stated that thefourteenth amendment to the U.S. Constitution establishes a minimum standard for the protection of individual rights and does not prevent this state's government from affording a higher standard. State v.Barton, 219 Conn. 529, S46, 594 A.2d 917 (1991). "Indeed, we have long abandoned the notion that our state due process clause; article first, § 8; has the same meaning and imposes the same limitations as its federal counterpart. Rather, we have held that the due process clause of the Connecticut constitution shares but is not limited by the content of its federal counterpart." (Citations omitted; internal quotation marks omitted.) State v. Morales, 232 Conn. 707, 717-718, 657 A.2d 585
(1995).
According to guidelines set forth in State v. Morales, the court must first determine whether the petitioner is claiming that exculpatory evidence was withheld from the petitioner by the state or whether the state has failed to preserve evidence that may be useful to the petitioner. Id., 714. In neither count one nor two of the petition can it be reasonably said that exculpatory evidence was withheld. If the evidence has been lost or destroyed then, under the Morales test, the court must consider the materiality of the missing evidence, the likelihood of mistaken interpretation of it by witnesses or the jury, the reason for its non-availability to the defense and the prejudice to the defendant. Id., 727. The petitioner urges the court to apply the Morales test to the facts surrounding both the failures of the state to conduct additional blood testing as well as the loss of the cigarette pack. The court agrees that this is the appropriate test to be applied under these circumstances.
Applying the Morales test to count one, the court finds that there has been no deprivation of the petitioner's constitutional right to due process. Testimony at the criminal trial demonstrated that both the victim and Torres had O-type blood. Torres was an acquaintance who had seen her at a bar earlier in CT Page 13606 the night and talked with her in the early morning hours by phone. The victim may have been on her way to see him when she was murdered. The petitioner had B-Type blood. The knife used to commit the crime was covered with O-type blood. Water taken from the kitchen sink trap in Torres' apartment indicated the presence of blood but it could not be determined whether the blood was human because of the presence of other human fluids. Additionally, since the blood in the trap was mixed with water, it could not be grouped by type. The underpants and jeans of the victim also had blood stains on them which, when tested, showed the presence of both O and B type blood. Finally, the scrapings under the victim's fingernails indicated the presence of O-type blood. Testimony at the criminal trial with respect to additional testing on the blood stains indicated that isoenzyme testing was not done until approximately eleven months after the crime was committed. The results were inconclusive.[7]
Additional testing ordered by the habeas court on the available blood samples was conducted in February 1997. Based on these DNA tests, the petitioner was excluded as the source of the blood on the knife. This result was hardly surprising. The tests were inconclusive with respect to the jeans and no sample was available to test the panties.
In applying the Morales test to the first count, the court does so mindful of the Supreme Court's direction that "where the crucial issue for which the evidence would have been offered was the identity of the assailant, the court must weigh the factors in that light. If, for example, the evidence could have been tested to demonstrate immutable characteristics of the assailant, then the prejudice factor would weigh heavily in favor of the defendant." State v. Morales, supra, 232 Conn. 727.
At the criminal trial, Abraham Stolman, chief toxicologist for the state of Connecticut, testified that isoenzyme testing was of value on fresh blood stains. Petitioner's Exhibit U, 1816-17. Dried blood, however, may give no information at all or in some cases misinformation. Id. All of the blood found on the evidence that was tested by the state laboratory contained blood samples that were dried at the time the samples were received in early August 1984.
Further testimony indicated that enzyme testing of blood samples could not pinpoint the actual donor but it can exclude a certain percentage of the population. Petitioner's Exhibit U, CT Page 13607 1866. Additionally, Beryl Novitch, a serologist with the state police forensic laboratory who ran certain enzyme tests in July 1985, testified at the criminal trial that the quality of the results of enzyme testing is impacted by age and conditions of storage. For example, sunlight, bacterial contamination, humidity, and other factors may affect the results of enzyme testing. Petitioner's Exhibit U, 1878. Thus the court concludes that it is possible that, if the testing had been done at a time shortly after the samples were collected at the scene, they may have excluded the petitioner as the donor. Equally possible, however, is that such testing may have yielded no results or even misinformation.
The court therefore turns to the other evidence presented at the criminal trial in order to determine the degree of prejudice to the petitioner that occurred due to the lack of testing. Numerous witnesses described a person who was wearing a red T-shirt and jeans in the area of the murder and at the scene at the time of its occurrence. Others described a man fleeing the scene as wearing the same items of clothing. The general description given by these witnesses fit the description of the petitioner. One witness arrived at the scene in time to see a man, six foot one inches in height standing over the victim dressed as the others had described.[8] Another witness at the criminal trial, Jackson, had a conversation for several minutes with the petitioner. Jackson described the petitioner as wearing a red T-shirt and jeans on the night that she talked with him shortly before the murder. Petitioner's Exhibit U, 477. Jackson identified the petitioner in court as the person she spoke with near the scene of the crime. Petitioner's Exhibit U, 465. In addition, Jackson testified that she saw a knife in the petitioner's rear pocket. She testified that the knife was similar to the knife found in the vicinity of the crime scene the next day.
Another witness, Philbrick, testified that she had been solicited for sex by the petitioner who was dressed in a red T-shirt and jeans. Philbrick went with the petitioner back to her apartment but grew fearful when he verbally threatened her and reached into his rear pants pocket for what she believed was a weapon. Philbrick also was able to identify the petitioner in court as the person who was in her apartment on the early morning hours of August 4, 1984. The petitioner was arrested on August 7, 1984 at his apartment pursuant to an arrest warrant. The police recovered from the apartment a red T-shirt that had been CT Page 13608 recently laundered. Petitioner's Exhibit U, at 874.
Aside from the red T-shirt, there was other evidence against the petitioner. Blood stains found on the victim's jeans matched the petitioner's blood type and did not match the blood type of the victim or Torres. In addition, two inmates who were incarcerated with the petitioner testified that the petitioner admitted to them that he was the perpetrator.
The evidence at trial, albeit circumstantial, was strong and persuasive. Considering all of the evidence, the court finds that if isoenzyme testing had been done in a timely fashion in August 1984 it is highly unlikely that it would have lead to exculpatory evidence being produced. In fact, it is more likely that if the tests had produced any results, the B-Type blood found on the jeans and panties of the victim would have produced inculpatory evidence. Thus the court finds, as to count one of the petition, that the petitioner was not denied a fair trial or due process of law under either theFourteenth Amendment of the U.S. Constitution
or article first, § 8 of the Connecticut constitution.[9]
The petitioner claims in count two of the petition that the state failed to preserve a pack of Newport cigarettes that were found near the crime scene.[10] Evidence at trial indicated that Torres, who was initially a suspect, smoked Newport cigarettes. Evidence at the criminal trial also showed that Torres had known the victim and had seen and talked with her the night of the stabbing. Torres' apartment was also relatively close to the scene of the crime. In some of the crime scene photographs a package of Newport cigarettes was clearly shown and the police, as part of their evidence gathering, collected as evidence a pack of Newport cigarettes. The package was tested by the state crime laboratory for fingerprints but none were recovered from the pack. The package of cigarettes was found near the crime scene along with the victim's clothes.
After considering the Morales test, the court finds no deprivation of due process rights under article one, § 8 of the Connecticut constitution as to the second count. The jury saw a photograph of the cigarette package and heard testimony concerning the lack of fingerprints on the package. The jury was not deprived of any information because the actual package could not be produced by the state at the criminal trial. The petitioner has failed to establish that he was deprived of a fair CT Page 13609 trial in violation of his due process guarantees.
As to count three of the revised amended petition the court finds that the testimony with respect to the results of the DNA testing was convincing and uncontroverted. There is no evidence to support the allegations of new exculpatory evidence in count three and therefore this claim must fail.
The court finally turns to the petitioner's claims in count five that trial counsel was ineffective in that he prevented the petitioner from testifying at trial. The right of a defendant to testify in his own behalf is fundamental. "The decisions which are to be made by the accused after full discussion with counsel are: (i) what plea to enter; (ii) whether to waive jury trial; and (iii) whether to testify in his or her own behalf." Johnsonv. Commissioner of Correction, 222 Conn. 87, 95 (1992).[11] The petitioner's right to the effective assistance of counsel is assured by the sixth and fourteenth amendments to the United States constitution and by article first, § 8, of the Connecticut constitution. Copas v. Commissioner of Correction,234 Conn. 139, 153, 662 A.2d 718 (1995). To establish that his trial counsel was ineffective, the petitioner must prove both that his counsel's performance was deficient and that the petitioner was actually prejudiced by such deficient performance.Strickland v. Washington, 466, U.S. 668, 687, 104 S.Ct. 2052,80 L.Ed.2d 674 (1984); Copas v. Commissioner of Correction, supra,234 Conn. 154; Lozada v. Warden, 223 Conn. 834, 842-43,613 A.2d 818 (1992); Bunkley v. Commissioner of Correction, 222 Conn. 444,445, 610 A.2d 598 (1992). To prove that his counsel's performance was deficient, the petitioner must demonstrate that trial counsel's representation fell below an objective standard of reasonableness. Aillon v. Meachum, 211 Conn. 352, 357,559 A.2d 206 (1989).
With respect to the prejudice component of the Strickland test, the petitioner must demonstrate that "counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." Strickland v. Washington,supra, 466 U.S. 687. Thus, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Id., 691. "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." Id., 693. Rather, a successful petition is required to demonstrate that there is a reasonable CT Page 13610 probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Copas v.Commissioner of Correction, supra, 234 Conn. 147.[12]
Trial counsel testified that he recommended that the petitioner not testify at the criminal trial. He also testified that, after discussing the issue, the petitioner did not indicate a desire to testify. Trial counsel was experienced in criminal law and understood the obligations of an attorney with respect to his client's right to testify. He testified that he told the petitioner that he, felt there was a possibility that the jury could find that there was reasonable doubt as to his guilt without the petitioner's testimony. He further advised the petitioner that he had a limited education and that he thought the petitioner, if he took the stand, would be "eaten alive." Habeas Transcript, January 16, 1998, 93. Trial counsel also testified that if the petitioner had wanted to testify that "he would have put him on." Id., 94.
The petitioner testified that trial counsel would not allow him to testify. The petitioner did testify that he had a discussion with counsel concerning testifying but that trial counsel told him he should not testify because he had "shifty eyes." The court finds trial counsel's testimony more persuasive. The petitioner has failed to meet his burden of establishing by a preponderance of the evidence that he was denied by counsel the right to testify or that he was unaware of this right to do so.
For all of the foregoing reasons the petition is denied.
Zarella, J.